Okay, next case of the morning is number 18-20326, a relator case, Deborah Lemon v. Nurses To Go. Mr. Cook? Good morning, Your Honors. May it please the Court, my name is Scott Cook, and I represent the relators in this False Claims Act case. This case involves allegations of false claims made by hospice companies for Medicare reimbursement. The District Court dismissed the case in its entirety on the pleadings, ultimately concluding that what the relators had pled was not fraud, but rather, in its words, mere laziness, bungled paperwork, and mistakes that had been corrected. This conclusion misconstrued the legal standards and failed to appropriately consider the First Amendment complaint. Well, you know, to be fair to Judge Hughes, I think you got off on the wrong foot with him when you said your clients didn't know for sure for whom they worked. I agree with you, Your Honor, I got off on the wrong foot. The exact nature of who they worked for and the corporate structure here is unclear. Of course, employer status is not an element of the False Claims Act, and what is clear is that you had a number of related entities all headquartered by the pleadings in Texas City, operating out of one location, all sharing a vice principal that was the same president and CEO, all doing business under the same trade names. We also concluded that all policies and personnel matters came out of the Texas City office. The claims in this case can be broken up into two broad categories. The first set of claims has to do with submitting bills without meeting conditions precedent, material conditions precedent. And those conditions precedent are that when you bill Medicare, you have to abide by certifications for hospice patients, which go to eligibility. You have to have required face-to-face encounters. You have to have plans of care that are individualized for the palliative treatment that goes to the hospice patients. And lastly, you actually have to follow those plans of care. The second set of claims has to go with submitting claims for reimbursement for unnecessary services. And these are the claims that the defendants were billing for continuous care hours. Continuous care hours is a unique subset within this Medicare hospice statute. It's the highest, it bills at the very highest rate. But with that comes limitations. It's limited to brief periods of crisis to manage acute medical symptoms. There was also an allegation in this complaint that on four occasions the defendants admitted patients that were already deceased and yet billed Medicare for the same. Now the district court dismissed the first set of claims on the basis of materiality. Those were the claims that said this is mere bungled paperwork and laziness. The district court dismissed the continuous care hour claims on the basis that the relator found the problem, she solved the problem. And lastly, the district court dismissed the deceased patient claims on the grounds that, well, a hospice is probably obliged to admit a dead person to make sure they're dead. And we believe all those reasons were in error. I'll first address materiality, which I think is ultimately the essence of the district court opinion in this case. How materiality is applied in the False Claims Act context is governed by the relatively recent Supreme Court decision in Escobar. And indeed, that was the only district court opinion, that was the only court opinion cited in the district court's opinion. But the district court didn't actually look to the Escobar factors. Now the first factor in looking at whether the failure to meet a requirement is material, according to Escobar, is whether the government has labeled it a condition of payment. Here it is abundantly clear that the government has labeled these conditions at issue as conditions of payment. And you don't have to dig into some obscure regulation here buried in paperwork. You can look to the very face of the Medicare Hospice Payment Statute. On the face of the statute, it says that conditions of and limitations of payment, it says that payment will only be made, this is coming from Congress, and it says payment will only be made if the relevant certifications are provided, the face-to-face encounters occur, which both go to eligibility, that you have a plan of care, and that the plan of care is followed. Did the — in drafting your complaint, were you aware of the — of the Prather, the first Prather decision? At the district court level? Yes. Yes, Your Honor. The first one. Yes. I was aware of the — I'm trying to remember. I think I was aware of the district court opinion. Because the second Prather didn't come out until mid-2018, so — Yeah, that came out, I think — Couldn't have been aware of that. No, that was between, I think, the district court's opinion and briefing to this court. Yeah, well, the reason I ask is that, you know, when you look through your — you do not allege that none of these people received care, right? That is correct. And only — Except for the deceased patients. Well, okay. You could have a relator claim for four people, perhaps, but — and you seem to allege that these four individuals worked in the office. They weren't out in the field. So that all these people were doing was observing paperwork and not the actual care that was extended. Is that — is that fair to say? I don't know if that's the reason why — You didn't allege otherwise, so — Well, I think an inference could be drawn. I mean, two of these are registered nurses. One was the — I think in charge of the hospital. Well, anybody can read paperwork, right? I mean, you're supposed to recertify every 60 or 90 days. Anybody can read paperwork. Okay. But what troubles me about your allegations is that Escobar says that just violating certifications alone is not enough to establish materiality. I agree with that, Your Honor. I mean, the question is, would the government care if these certifications weren't being done? So you need to address that. And the other thing you need to address, in my view, is the fact that this Court has pretty clearly said you're supposed to comply with Rule 9b, right? B? Yeah. Let me — let me address your first point, Your Honor. Again, I think the first reason we know that the government cares that these conditions are met is because it's on the face of the statute. It's repeated in the regulations as well. And also, the relators pled that this is something — certifications have been an issue in which the OIG's office has looked at into civil and criminal investigations. We also pled that the U.S. Attorney's Office has intervened in cases where — hospice cases where certifications were an issue in the case. But I think — I think your question may go a little deeper than that. And why does this matter? I mean, why does this go to the essence of the bargain? And the reason is because the government was not getting what they're paying for. What the government is paying for is services provided to a limited subset of individuals. Those are — those individuals are people that are going to die within six months. That's what hospice pays for. And it also pays for not just kind of a random treatment, drop-in. It pays on — it pays for a specific treatment by a plan and following that plan. Well, and again, you have the allegations that the plans weren't followed. But what is the basis for that allegation? Well, I think the allegation was based on — my clients — inferred from the pleadings, my clients were there in the office watching what was happening, and they saw from an audit of charts we pleaded that some of these people didn't have any plans. For one year, through an audit of charts, they determined that no individuals had individualized plans. So I think it's a fair inference that people weren't being treated according to an individualized plan. But they were being treated in some way. Yes, Your Honor. They were being treated. If Medicare auditors had come in and gone to — you cannot contradict — I don't know whether it's a fact or not, but you haven't gone further and said that if Medicare auditors had come in, they would have gone to Mrs. Smith and found out that she was still alive and going to the grocery store. I don't think the pleadings go that far, Your Honor. What they say is that what the government is paying for is not happening here, and that's material. And I think the most persuasive opinion — Well, the government is paying for end-of-life care. And I understand the importance of certification, but it just — it seems to me it's — post-Escobar, you have to allege more than simply the certifications. Okay. Well, I think that — I think post-Escobar, certainly the plans of care and having a plan of care is sufficient materiality. The government's paying for something. They don't want people just to show up randomly, drop by on these patients. They're supposed to be receiving specific palliative treatment according to a plan. And that's not what we allege is happening here in this instance. I think that the Prather case from the Sixth Circuit is certainly not binding on this court. I think it's persuasive. That case involved home health care in the Medicare context. And the issue in Prather in the Sixth Circuit was the timing of certifications, the timing of face-to-face encounters like you have here. And in that decision, the court ruled that timing, late certifications, late face-to-face encounters was material under Escobar. That — I mean, they cite different regulations and a very serious dissent. Yes, Your Honor, I agree that the dissent is serious. I will note, though, that the dissent acknowledges that certifications in themselves are material. The dissent says timing of certifications, that's too much. But a certification itself is material. Well, the first certification is if the patient is critically ill and not expected to live more than six months. And that requires a doctor's certification. To start the ball rolling to get Medicare to owe anything. Is that right? Yes, Your Honor. At the very start, there's supposed to be a certification, and then 90 days later, at the 180-day mark, there's supposed to be a face-to-face encounter. That was added to the statute. That shows how important it is to the government that these people are actually eligible. These certification requirements are kind of — and this is ultimately one of the reasons that the Prather court relied on — this is the gatekeeper to make sure that fraud isn't occurring and that people are eligible. And so the certifications happen at 90, 180 days, and then 60 days thereafter. And that's what Congress determined was the way to make sure. I think the timing requirements also show how important this is. If this wasn't material, why not certify these people once a year, once every couple of years? Well, again, the idea of terminal care is they're not supposed to live longer than six months. But it seems to me your plaintiffs could have easily found out some of the doctors who were giving some kind of certification and called the doctor and said, have you authorized this? Well, I think there are pleadings. In the pleadings, there's an admission that the medical director in the Austin office acknowledged that there were problems with the certifications and stated, I'm worried about the company. There was an individual who was hired to audit charts in the Austin office who remarked, I don't know how this company is still open. And so I think that the pleadings are very clear. Why didn't she call the U.S. attorney? She's not my client. I'm not sure I can answer that. Why didn't your clients call the U.S. attorney? Well, they submitted this complaint to the U.S. attorneys through this process, Your Honor. Well, as Judge Hughes mentioned, there have been a litany of Medicare, Medicaid fraud cases. What about this business about unnecessary services in the continuous care area? Because it seemed to me that Ms. Lemon, I suppose, did get them to change their practices. She did. What the pleadings state is, is that she heard about this fraudulent scheme at training in particularity in a second. When she arrived in the Austin office, she found that there were unnecessary continuous care hours. And she stopped that. She trained people. And she did fix the problem. That's correct. But that doesn't absolve the defendants of liability for the problems she found when she got there. And she put that had been going on for a long time. And it doesn't absolve the defendant for liability in all the other offices in the general scheme coming out of the Texas City office. In regards to particularity, which you asked before, I'll touch on that briefly. We believe this. First of all, we believe the district court ultimately didn't reach the issue. If this court reaches it, we believe we've pled enough. But this court need not do that. And on several occasions, this court has left the 9B challenge to the district court in the first instance, including the— You really want us to do that? I do, Your Honor. In the Bonder Shipyard's case, it was a Judge Davis opinion. The court sent back the 9B challenge to the district court with the note that, on remand, the district court, if it had a problem with particularity, could consider less drastic alternatives to dismissal, such as leave to amend, or further discovery. How much discovery opportunity did you have? Zero, Your Honor. And in the Bonder Shipyard's case, I think—I don't know how much discovery there were. I wasn't part of the case. But from reading the opinion, there were, I think, talks of tens of thousands of pages of documents that had been exchanged at that point. Well, your people weren't just whistleblowers. They were the people who were in charge of the documents. So presumably, they know what the documents contained. I mean, so discovery would just prove what they claim they already know, right? I think—you know, where I see discovery would be to—if a district judge has a problem with the particularities of the defendants all acting together, that's something that could be solved, for instance, I think, in an hour corporate rep deposition. And that was what he had an issue with at first, or who was technically their employer. To me, that's not material to this—our issue here. But if the court had an issue with that, those are things that could be resolved very quickly and very minimally. I have a question about the policy of the company on the continuous carrier, for example. You know, a deposition of Crowder or somebody else could maybe enlighten that. I think so, Your Honor. I think it would also enlighten why all the bills were going through Texas City, why there are all these different entities. I mean, you have two hospices— I mean, I do think at some point they point out that your client also spoke about billing through the Austin office. Yeah, what we—I think if you look carefully at the pleadings, what it says is that it was—the hospice billed for services out of the office. The bills were actually going through the Texas City office. It's a small distinction. But the pleadings suggest, the inference to be drawn is that the bills were through a central site in the Texas City office. Okay. We have a chance for rebuttal. Mr. Johnson? Good morning. May it please the Court. This is a—this is a fraud case. And Judge Hughes probably decided that these pleadings had not met adequately pled fraud with regard to—which, whatever standard you apply, particularity under Rule 9b or the materiality standard under Escobar— He didn't cite 9b, but I guess we have to read the tea leaves. Well, I understand that he didn't cite 9b, but again, this is a fraud case. When you're talking about materiality, I don't think you can talk about materiality without talking about the heightened pleading standard under Rule 9b. In the Escobar opinion, Justice Thomas was very clear that the materiality standard is rigorous. It's demanding. It suggests a heightened pleading standard more akin to 9b. Talking about the Prather dissent, as Judge Jones mentioned earlier, that's specifically what the dissent said, that materiality is not something that can be generally alleged. It must be alleged with specificity. These pleadings are inadequate in a number of ways, not just with regard to materiality, but to the specifics. And that's what Judge Hughes mentioned several times during the bench conference in citing this motion, that the specifics are missing here. We don't know how all of this was supposed to work. The backdoor that the relators are using in this case is the Grubbs standard, which says you can plead the particular details of a general scheme with reliable indicia that they don't meet that standard. Every case that's looked at the Grubbs standard says this is not a backdoor around particularity or specificity in your pleading. You still have to tell us how it worked. They haven't done that. They've alleged generally a scheme involving eight different defendants, seven companies and one individual, all in different areas. These are separate, distinct legal entities. And then they give these specific examples. Their examples are in 137 and 139 of the Record on Appeal. The specific examples are the same every time, that a hospice patient X was admitted into the Austin office, and then all defendants failed to provide certification. There's no reasonable inference that a San Antonio office failed to provide certificates in Austin. They alleged that the person who came down to train them when they started to work told them that you should set the patient up for continuous care, every patient for continuous care for the first three days. So that's how they were trained. They alleged that's how they were trained to do it, by the staff person sent down by the personnel who was in charge of the operation. And then they alleged the conversation with Crowder, is that his name? Yes, sir. That he pretty much told them the same thing, that this was a marketing tool, they should set the bill up for continuous care for the first three days. But, you know, if the CEO tells them that, isn't that pretty much from the horse's mouth? Well, the difference here is, Your Honor, when you're talking about an internal policy of providing continuous care hours, is what they're talking about, that doesn't lead, that's not reliable in judicia, leading to a strong inference that bills were actually submitted. Providing continuous care hours and actually billing the government for them are separate items. So in this instance, and this Court has made that determination in the Nunnally opinion, that general allegations of pattern and practices, bad internal policies, are not sufficient to properly allege fraud. Didn't they look at the files and see that they've been billed for that? That doesn't appear in the pleadings. No, this only regards the sufficiency of the documentation of the charts, doesn't it? That's correct, Your Honor. They say that maybe the charts didn't warrant continuous care hours. Again, none of the relators are medical professionals. Some of them are nurses, others are administrators and bookkeepers and the like. Well, that's, I mean, that's who does this work of maintaining the files. But there is no allegation that people did not receive care. And as far as, I mean, there's no allegation, you know, usually in these things you say it's counted by a million dollars, but all you have here is that the certifications weren't kept up. That's correct. So presumably somebody was submitting bills, but these people don't allege that they saw fraudulent bills. I mean, when the CEO told them that this is the way you're supposed to set up the file, can't you infer from that that there was a reason that he was doing that? Well, again, they're inferring that there's a reason and inferring what that reason is are two different items, Your Honor. When you're talking about the reason to be a successful business, we need to have patience and we want to draw patience. And we want a bill for the first three days at the higher rate. What else could he have in mind? Well, when you're talking about the idea that we're telling people that this is what we want to do, that's a pattern and practice argument, and it doesn't tie to any bills actually being submitted to the government. When you're talking about these general scheme ideas, you have to let the lower court and this court know, how does it work? So with regard to submitting bills, who is the person recording, making the false record? Who is the person that is sending these bills to the Texas City office? How does the billing system work? In the Grubbs case, it was rife with examples of the actors involved, the dates and the times that the actual fraud was taking place. Details of the billing system, including the billing codes that were used to be submitted to the government. I mean, again, here they're alleging at page 20, defendants received payment for such services from Medicare, despite not meeting conditions precedent to payment. Defendants maintained a pattern and practice of seeking payment from Medicare for services and so on. But again, it doesn't say any particularity about dates, amounts, nothing about a bill. Wouldn't it allow some discovery to get all this information and be only in the hands of a defendant? No, Your Honor. Rule 9B, the materiality standard, Rule 8, the requirement of adequately pleading these claims, is in place to operate as a bar against cases reaching discovery when they haven't met the burden of adequately pleading fraud. And they have not met the burden here of adequately pleading fraud. The hope that they're going to discover themselves into a case of fraud is precisely what Rule 9B and the materiality standard are designed to prevent. Well, you know, the Prather case is out there. How do you distinguish Prather? The Prather case involved, first of all, I believe in the Prather, that the Prather decision was wrongly decided. I agree with the dissent. The dissent stated that the materiality should be a heightened pleading standard. Nevertheless, the Prather decision involved, I believe, actual false records. There was also actual cites to OIG information about the materiality of these timings and certifications. In contrast, in this case, there are, I think, a single paragraph in the first submitted complaint alleging what they say are the Escobar materiality factors. And they say, well, in some instances, the OIG takes enforcement actions. In some instances, the CMS has said these things are important. And then in some instances, the government intervenes. I think it's important to note that that's not adequate pleading either under Rule 9B or under Rule 8. Because it doesn't give us the specific actions that the government has taken. It doesn't give us the specific outcomes of those cases. It gives us no facts leading us to understand that this is how the government behaves with regard to these certification issues. So one of the things that the Escobar case does tell us is that even if you have conditions of payment, that's just one factor. That's the only factor that was adequately pled at the pleading stage in this case was the condition of payment. And they cited to the statute. Now, we rebutted that with the CMS Medicare Integrity Manual. And the regulations calling some of those things conditions of participation and showing that Medicare does not deny payment on those issues. But even so, you must also show with regard to the Escobar factors that there's a payment history. That the government denies these types of claims. And that this goes to the essence of the bargain. None of that was adequately pled. No notice pleading of that was even given. The opposite is true. In fact, in page 7 of their reply brief, the relators admit that the record is silent with regard to payment history of the government. There is no pleading on file that suggests that these defendants knew that these missing certifications were material to the government's decision to pay. You cite one isolated excerpt from the manual. I just thumbed through it. And in another place in the manual, it says, Medicare contractors shall deny the claim is not meeting statutory requirements under the FCA when the provider fails to comply with the plan of care requirements. So, and the excerpt that you cited from conditioned it on it not affecting the payment. And, of course, all of these would affect the payment. Well, that's, I don't think that's necessarily true, Your Honor, when you're talking about the decision to pay and whether it would affect the payment. Our site to the CMS program integrity manual, Medicare integrity manual, excuse me, mentioned that conditions of participation, which include the plan of care, are not a basis to deny. And that CMS resources shouldn't be used to deny. The amount of payment to Medicare. There's been no allegation in this case that payment would have been different, Your Honor. And that's when Judge Jones was alluding to that earlier. There is no allegation in this case that care was not actually provided, that inappropriate care was provided. Well, you know, it seems to me that, I mean, they might have a stronger case if, for instance, they were saying not only were there no records and they didn't care about the records, but in fact all these patients were in hospice care for two years or more. You know, which would have meant that some physicians were apparently certifying people with great latitude about their medical condition. Even in that instance, Your Honor, they would still be obligated to tell us who is providing the service and who is billing for the service. And that's a major issue. I understand that. I mean, but I'm saying that there's not even that level of question about the actual provision of services. I mean, typically what we've seen in these criminal cases is that they've gone out and they've been soliciting patients from their friends and relatives. That they've had one doctor sort of on the take who is paid to solicit certifications. Or that they have been ignoring the recertification process. And each of these, those are in Medicare. And, you know, there's a lot here that's not in those criminal cases. I understand what the court is saying. But with regard to specificity, we still don't know who they allege is falsely billing the government. And in many cases don't allege that bills are being submitted at all. With regard to the continuous care hours, just as an example, they say that there was a, and again, pattern and practice allegations are not sufficient, but allege that there was a pattern and practice of providing continuous care hours without ever saying that, okay, we also submit bills to the government for those, except generally, but without saying who actually provides the hours, who's actually creating the records or putting together the records, who's actually transmitting the bills. All of those things were present in the Grubbs case, identifying the billing system, identifying the actors, the time, place, and contents of the activity that constitutes fraud. None of that is present here. The Nunnally opinion issued by this court that looked at the Grubbs standard, applying it, said that just a scheme, the scheme is not a backdoor into fraud. The scheme must show not just general pattern and practice, internal policy problems, but actual reliable indicia leading to a strong inference that bills were actually submitted. This certification idea is the way that they're trying to connect this by saying, every time you've submitted a CMS form 1450 that you have committed fraud, if you're missing a certification, and that's precisely what Escobar rejected. Escobar says, no, not every time that you submit a bill or a general averment to the government in submitting a bill is fraud. With regard to the idea that Judge Hughes did not consider, properly consider, fraud or the pleading standard when he was issuing his opinion, we just disagree. When you're talking about fraud, he says in the last line of his opinion, none of these allegations rise to the level of fraud, and that's two parts. That's the materiality standard and the Rule 9b standard. When you're talking about fraud, I think that necessarily it includes both. What do you say about the allegations about the related companies, that these relators can sue on behalf of what they claim is all related companies? The all related companies is, I've seen that they've said, we can just sue everybody and allege the same thing, but they haven't alleged the same thing. When you say, hey, we're admitting patients in Austin through an Austin office, they've identified two hospice companies in Austin. They don't explain, and it's not a reasonable inference from the pleading, that a company in Corpus Christi is failing to provide certifications in Austin. So, by its very nature, they have not alleged the same activity by each defendant, especially when all of their specific examples only include the Austin office. To say, generally speaking, that this was a scheme and that all these people were involved, doesn't satisfy the Grubb standard. The Grubb standard is that you must identify particularly each person's role in that scheme. You can't just say, generally speaking, all these people were involved in a scheme to defraud Medicare, and that's it. Okay. Do we have any other questions? Okay. Thank you. Judge, thank you. Mr. Cook. I want to address a few points, and one of the points this Court brought up. Judge Jones, you asked about whether, or commented, what was the indicia that some of these patients, for the certification patient's example, shouldn't have been there in the first place. I believe that the failure to certify is the material issue here, but in our pleadings, there are specific examples by initial of seven patients. All of those patients were there for more than one year. One patient, C.B., we pled, had been on hospice since 2009. This is in the record at 137. It's paragraph 43 in the complaint. Paragraph 43. Yes, Your Honor. And I think a reasonable inference, and this is why you have these certification requirements, is this is someone that was supposed to have died within six months, and I'm glad that the personnel outlived where they were supposed to, but this raises serious concerns. This is why we have the certifications. This is why they're material, to ensure eligibility, and that the government isn't paying hospice services for people that shouldn't be there. What about the argument that you didn't allege that bills were submitted, and who that biller was, and so forth? Yes, Your Honor. I think what Grubbs teaches us is that the details of the bills are no longer necessary to meet the 9B standard. My reading of the Grubbs case, I don't think there was details of exactly who was submitting the bills. I know there wasn't details of who the actual patients were. Did the record show that they were billed for services? In Grubbs? No, no. Okay, I apologize, Your Honor. What we pled was that bills were submitted, and the inference was drawn. It's a reasonable inference that bills were submitted here, and the continuous care hours would make no sense in a for-profit business to have people there on a 24-hour basis, unless you were billing for that. It would make no sense, for example, these hospice patients that were there for a year or longer. We pled that bills go out monthly. A for-profit hospice is not going to be treating patients for an excess of a year if they're not billing Medicare for the same. So I think here it would be logic dictates that bills were sent for all these patients. Well, suppose the person was in hospice for, as I understand it, hospice has a widely varying quantity of services that are provided to each patient. You could have someone who is nominally in hospice for a year, but you'd have one person go out once a week to give them a bath, right? Yes, Your Honor. So that's a fraud on Medicare that they get a bath once a week? I didn't follow your question. If there's not a certification and not a face-to-face? In my opinion, it is a fraud, because the fraud is— Well, I don't want to know your opinion. Let me give a basis for it then, Your Honor. The bills, what we pled is that the bills are sent on a form called UB 04 CMS 1450. And there is a certification in writing on that that says certifications are on file. And so when these companies, in your example, when they submit it, a bill for this one person,  And I believe it's material because the government cares that this standard be met to ensure that only eligible patients are treated. So you tell the IRS that you have documents for every charitable contribution you gave last year, and oh my goodness, it turns out that the church forgot to send you their receipt. And you have misled, you have defrauded the government.  But I, second of all, I don't think that's comparable here. Well, I don't know. The IRS, 1001, everything you do to the IRS is material as far as they're concerned. Well, and I certainly don't take the position that failure to meet regulations— That's what I'm trying to get at. What is there that heightens this, that transforms it from failure to satisfy the documentation to fraud on Medicare? To me, it's because these are meaty requirements. These go to the essence of the bargain. They're on the face of the Medicare hospice—on the Medicare hospice payment statute itself. And I believe they're on the face of that because Congress wanted to ensure that only eligible patients were treated. I think it's a necessary gatekeeper to prevent the kind of fraud that's being pleaded here. And I believe that's, you know, the inference of why the fraud is occurring here. And your best case for these propositions about Medicare are what? I think the Prather decision and I think my reading of Escobar, Your Honor. And Escobar on remand in the First Circuit case as well. Okay, great. Thank you. All right. Thanks very much. Court has concluded our sitting for the week and we will stand in recess. Thank you.